FRYMAN ET AL., D. B. A. FRYMAN & KUCK, APPELLEES, *v.* McGHEE ET AL., APPELLEES; BARNES, D. B. A. IRA W. BARNES' SONS, ET AL., APPELLANTS.

(No. 2485—Decided October 20, 1958.)

*Messrs. Coolidge, Wall & Wood,* for appellee The Winters National Bank & Trust Company.

*Mr. Harold F. Demann,* for appellant Ira W. Barnes' Sons.

*Messrs. Shaman, Winer, Shulman & Ziegler,* for appellants Charles C. Bowman & Son and Edgemont Builders Supplies, Inc.

CRAWFORD, J. This is an appeal on questions of law and fact. The issue presented is that of priority between a real estate mortgage given by the owners, William H. McGhee and Martha Z. McGhee, to the defendant-appellee, The Winters National Bank & Trust Company, on the one hand, and mechanics liens claimed by the defendants-appellants, Ira W. Barnes, doing business as Ira W. Barnes' Sons, Charles Bow-

man and Son, and Edgemont Builders Supplies, Inc., on the other.

The premises were sold upon foreclosure proceedings in the Common Pleas Court and the insufficient proceeds were ordered applied first to the mortgage, leaving nothing for the mechanics lien claimants.

The bank has raised questions here about the validity of the liens of Barnes and Bowman. However, assuming their validity for the present, we first proceed to the question of priority.

The evidence indicates that on March 5, 1956, the McGhees obtained a deed to the premises from Warren G. Gibbs and Addie Mae Gibbs, and partially financed the purchase by delivering a mortgage on the same day to the bank. The mortgage was filed for record on the following day, March 6, 1956.

The premises consisted of 11.993 acres with an existing building, and had previously been known as the Beachwood Club. At some time not clearly established by the evidence the McGhees conceived a development plan of some magnitude, entitled "One Man's Dream," including a "Beach-Pool and Terrace" extending over 25,000 square feet, a "Patio-Bar and Steak Room," a concrete dancing pavilion, a picnic grove and shelter houses, fireplaces and picnic tables, a "Little Acorn Beach" or wading pool and accessories for children, parking lot, baseball field, standard courts for tennis, basketball, volley ball, handball, shuffleboard, and a variety of other games, etc. All these attractions were to be available to a selected group of members of what was to be known as "The Oak Leaf Club."

There is no evidence that the bank was notified of this project or that they inspected the premises prior to accepting and recording the mortgage.

On June 25, 1956, defendant-appellant Barnes began drilling wells on the premises to obtain a water supply for the swimming pool. Considerable difficulty was encountered in finding an adequate supply, with the result that Barnes' last work was not performed until August 20, 1956.

Beginning on July 9, 1956, and concluding on July 25, 1956, defendant-appellant Bowman did excavating and grading, and furnished some crushed stone.

Beginning in "early 1956" at some date apparently unspecified in the evidence, but concluding on April 26, 1956, defendant-appellant Edgemont Builders Supplies, Inc., furnished corrugated pipe.

Steps were taken by all three of these defendants-appellants to perfect mechanics liens, which we are assuming at this point to be valid.

These facts standing alone would result in priority of the bank's mortgage over the liens. But defendants-appellants base their claim to priority over the bank's mortgage upon the fact that one Robert Spain, doing business as S. & S. Floor Covering, covered with vinyl tile the entire concrete floor of a building already located on the premises before the McGhees purchased them. The evidence indicates that this work was contracted for by the McGhees and Spain on February 27, 1956, and Spain testified that the materials were delivered and work begun on March 1, 1956, and concluded on March 23, 1956.

The bank produced witnesses consisting of the McGhees' grantors, Warren G. and Addie Mae Gibbs, and two of the Gibbs' relatives, who testified that they visited the premises on Sunday, March 4, 1956, and saw no evidence of the floor work. Some of those connected with S. & S. Floor Covering testified that at that time the work had been done only in some of the more remote portions of the building, that nothing more than sanding had been done in the main room and that possibly the unused materials were stacked behind the bar.

It seems reasonable to conclude that the floor covering work extended over the period testified to by Spain, but that on March 4th it may not have been conspicuous upon casual view.

Spain accepted a note for his work and never attempted to perfect a mechanic's lien. This circumstance is unimportant in view of our conclusions reached upon other facts in the case.

The appellants base their claim to priority upon the provisions of Paragraph (B) of Section 1311.13, Revised Code. That section, so far as pertinent, reads:

"Liens under Sections 1311.01 to 1311.24, inclusive, of the Revised Code are effective from the date the first labor is performed, or the first machinery, materials, or fuel is furnished by the contractor under the original contract * * *.

"(A) If several liens are obtained by several persons upon the same job they have no priority among themselves, except that liens filed by persons performing manual labor have priority to the extent of the labor performed during the thirty days immediately preceding the date of the performance of the last labor.

"(B) Such liens shall be preferred to all other titles, liens, or encumbrances which may attach to or upon such construction, excavation, machinery, or improvement, or to or upon the land upon which they are situated, which shall either be given or recorded subsequent to the commencement of said construction, excavation, or improvement."

The vital question in the case is whether this work of Spain's was so connected with the work and materials of the three defendants-appellants in developing "The Oak Leaf Club" as to constitute part of "said construction, excavation or improvement" so as to date their liens back to the beginning of Spain's work on March 1, 1956.

Circumstances vary so greatly from case to case that none of the authorities cited furnishes a complete answer. However, certain principles have been established which are determinative.

First of all, it is obvious from the statute and from all the cases that the beginning of the "construction" must be the beginning of the same improvement for which the liens are claimed. Section 1311.13, Revised Code; *Geer* v. *Tuggle,* 22 N. P. (N. S.), 129, 29 O. D. (N. P.), 552; *Ohio Savings Assn.* v. *Bell,* 25 Ohio App., 84, 158 N. E., 548.

In the second place, the construction must be of such a nature as to be "reasonably apparent" upon inspection. *Rider* v. *Crobaugh,* 100 Ohio St., 88, 125 N. E., 130; *Ohio Savings Assn.* v. *Bell, supra* (25 Ohio App., 84).

Spain's work was an improvement on a part of the same premises and for the same owners as the work and materials of the three defendants-appellants. Further than that there is no connection shown between Spain's floor work on the pre-existing building and the later development which one of the defendants-appellants called "a very grandiose project."

The brochure, membership application, etc., of The Oak

Leaf Club introduced in evidence are not dated; they appear from the testimony to have been exhibited by McGhee to defendant-appellant Barnes during Barnes' operations upon the premises. The Oak Leaf Club was incorporated on May 22, 1956. Application for a building permit for the major improvements and the accompanying plans were dated June 14, 1956. Of course these contain no reference to Spain's tiling of the old floor, which tiling had already been done.

As we have seen, Spain's work was completed on March 23, 1956. Barnes' work began on June 25 and Bowman's on July 9, 1956. The date of Edgemont's first supplying of material is not fixed, but described only as "early 1956"; its last delivery was on April 26, 1956. Therefore, so far as definite dates are concerned, there is no proof that any part of Spain's work was simultaneous with the work or delivery of any of the three defendants-appellants. Some of the latter make vague mention of seeing an "electrician," but none mentions Spain.

There is nothing in Spain's operation to suggest a plan for the additional work subsequently done by the defendants on other parts of the premises. Therefore, an inspection of the premises on March 5th and 6th, the dates of the giving and filing for record of the bank's mortgage, would not have revealed the larger plan, if indeed it then existed in the mind of McGhee.

It is not shown that on February 27, 1956, when McGhee entered into the contract with Spain, and before he had completed the purchase of the premises on March 5th, he contemplated the later major improvements which were to constitute The Oak Leaf Club. If he had, there is no evidence that notice of such fact was brought home to the bank, or to anyone else at that time, or at any time prior to the filing for record of the bank's mortgage.

One circumstance in this case which, while not conclusive, is illuminating, is the fact that at the time of Spain's first work on March 1st, McGhee had not yet acquired title to the premises. A similar circumstance had some weight with the court in the case of *Becker* v. *Wilson,* 30 Ohio App., 340, at page 343, 165 N. E., 108.

We do not mean to say that a lien claimant can be defeated because he deals with one who is not yet the owner at the time but who subsequently acquires title. (See *Golner* v. *Bede,* 11 Ohio App., 137.) But this being an appeal on questions of both law and fact, it seems appropriate to observe that it is possible but unlikely that one not yet the owner of premises would actually have embarked upon the elaborate and expensive plans involved here until he acquired title. This probability accords with our findings that there is no evidence that such a project was conceived, much less begun, when Spain started his work.

Furthermore, the state of the title, which was necessarily known to the bank, is a circumstance to be taken into account also in determining whether the bank could be charged with notice that McGhee had already entered upon so vast a plan of improvement, even if it had been aware of the reflooring by Spain.

There is no evidence upon which to base a conclusion that Spain's installation of the tile flooring in the pre-existing building was the commencement of or had any connection with "said construction, excavation or improvement," or that such construction, not yet having begun, was or could have been "reasonably apparent" at the time the mortgage was taken and recorded.

We conclude, therefore, as did the Court of Common Pleas, that the liens here asserted cannot be related to the date of the beginning of Spain's work, and that the bank's mortgage must be held to be prior to the mechanics liens.

The available proceeds being inadequate to satisfy the bank's mortgage, it is unimportant to determine the validity of the liens.

However, the attack made by the bank against the validity of the liens of Barnes and Bowman because they each filed but one affidavit for work apparently performed in installments, must be resolved in favor of the lien claimants in view of all the circumstances of this case. *Condon* v. *H. C. Hazen Contracting Co.,* 122 Ohio St., 100, 170 N. E., 870.

We accordingly hold that the available proceeds should be

first applied to the bank's mortgage and any balance prorated among the three lien claimants now before us.

Judgment may be entered accordingly.

*Judgment accordingly.*

HORNBECK, P. J., and WISEMAN, J., concur.